IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

VERICOOL WORLD LLC,
    Plaintiff,



    v.

Civil No. 1:23cv1761 (DJN)

TEMPERPACK TECHNOLOGIES, INC., and
TEMPERPACK VIRGINIA, INC.,
    Defendants.

**MEMORANDUM OPINION**

This patent infringement action comes before the Court on Defendants TemperPack Technologies, Inc. and TemperPack Virginia, Inc.'s (together, "TemperPack") Motion to Dismiss (ECF No. 18). Plaintiff Vericool World LLC ("Vericool") asserts TermperPack's infringement of U.S. Patent Nos. 11,040,818 (the "'818 Patent"), 11,358,780 (the "'780 Patent"), and 11,794, 983 (the "'983 Patent") (together, the "Patents" or the "Asserted Patents"). In its Motion to Dismiss, TemperPack contends that Vericool lacks sufficient rights in the Asserted Patents and thus lacks constitutional and statutory standing to sue. For the reasons below, the Court will DENY TemperPack's Motion.

## I.      BACKGROUND

The Asserted Patents address a compostable insulation panel for shipping containers. (Compl. (ECF No. 1) ¶¶ 12–14). This insulation is used by the food delivery, pharmaceutical and health care industries to ship goods that require cold storage during transport. (*Id.*). The product's competitive advantage lies in its environmentally friendly packaging, which was designed to comply with various municipal bans on polystyrene foam. (*Id.*).

The Asserted Patents were invented by Darrell Jobe, the founder and CEO of Vericool. (*Id.*; Declaration of Darrell Jobe ("Jobe Decl.") (ECF No. 31) ¶ 1). Shortly after the Patents were issued, they shuffled between owners. Jobe first assigned the Asserted Patents to Vericool, Inc., which then transferred them to VCOOL LLC, which in turn assigned them to Vericool World, the plaintiff here, on December 20, 2021.[1] Two days later, on December 22, Vericool conveyed a security interest in the '818 and '780 Patents to non-party Storopack, Inc. (*See* Intellectual Property Security Agreement ("2021 Security Agreement") (ECF No. 19-5)). Vericool supplemented Storopack's security interest on February 1, 2023, to add the '983 Patent. (Amended and Restated Intellectual Property Security Agreement ("2023 Security Agreement") (ECF No. 19-6); '983 Patent Assignment History at 1). That same day, Storopack and Vericool executed a separate licensing agreement that gave ███████████████████████████ ███████████████████████ (Amended and Restated Patent and Know-How Ownership and License Agreement ("License Agreement") (ECF No. 31-1) § 2.2(b)).

Meanwhile, Vericool learned that TemperPack was marketing a recyclable thermal insulating panel to Vericool's target industries. (Compl. ¶ 15). On June 22, 2021, Vericool informed TemperPack that its products infringed the '818 Patent. (*Id.* ¶ 16). On August 3, 2022, Vericool informed TemperPack that it was also violating the '780 Patent. (*Id.*) These communications proved unsuccessful, so on December 21, 2023, Vericool sued for infringement of the '818, '780 and '983 Patents. (*Id. at ¶ 17*, pp. 6–10). On March 5, 2024, TemperPack moved to dismiss the Complaint under Fed. R. Civ. P. 12(b)(1) and 12(b)(6) on the theory that

---

[1]      ('818 Patent Assignment History (ECF No. 19-2) at 1–3; '780 Patent Assignment History (ECF No. 19-3) at 1–3; '983 Patent Assignment History (ECF No. 19-4) at 1–2).

Storopack's security interests in the Asserted Patents deprive Vericool of constitutional and statutory standing.  TemperPack's Motion has been fully briefed and stands ripe for review.

## II.    STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(1) challenges a court's subject-matter jurisdiction. This challenge may proceed in one of two ways.  First, a defendant can assert that the complaint "fails to allege facts upon which subject matter jurisdiction can be based." *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982).  In this posture, the facts alleged are presumed to be true and the motion proceeds akin to a conventional Rule 12(b)(6) motion.  Second, a defendant can aver "that the jurisdictional allegations of the complaint [are] not true." *Id.*  When a defendant disputes the veracity of the facts supporting subject matter jurisdiction, a court may "consider evidence outside the pleadings" and "decide disputed issues of fact with respect to subject matter jurisdiction" without converting the motion to one for summary judgment. *Velasco v. Gov't of Indonesia*, 370 F.3d 392, 398 (4th Cir. 2004); *Kerns v. United States*, 585 F.3d 187, 192 (4th Cir. 2009).  The party invoking the court's subject matter jurisdiction bears the burden of proving that jurisdiction exists, *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 768 (4th Cir. 1991), reflecting the ordinary rule of civil litigation that "plaintiffs bear the risk of failing to prove their claims." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005). If a court concludes that it lacks subject matter jurisdiction, the court must dismiss the action. *Kontrick v. Ryan*, 540 U.S. 443, 455 (2004) (citing Fed. R. Civ. P. 12(h)(3)).

By contrast, a motion to dismiss under Fed. R. Civ. P. 12(b)(6) "tests the legal sufficiency of the complaint." *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017), *as amended* (Jan. 20, 2017).  To survive a 12(b)(6) motion, a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556

3

U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 570 (2007)).  When ruling on a 12(b)(6) motion, a court "must accept as true all of the factual allegations contained in the complaint." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007).  But those allegations must contain more than "'naked assertions' devoid of 'further factual enhancement,'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 557 U.S. at 557) (internal alterations omitted), and a district court need not "accept as true a legal conclusion couched as a factual allegation." *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014).

### III.    ANALYSIS

#### A.    Choice of Law

As a threshold matter, the Court must specify which body of substantive law governs each issue.  Because the Federal Circuit possesses exclusive jurisdiction over civil actions arising under the Patent Act, 28 U.S.C. § 1295(a), Federal Circuit precedent governs issues "unique[] to patent law." *Duro-Last, Inc. v. Custom Seal, Inc.*, 321 F.3d 1098, 1106 (Fed. Cir. 2003).  But "the law of the regional circuits" governs "matters of procedural law that do not implicate issues of patent law." *Id.*  And patent ownership constitutes a matter of contract, under which "state law, not federal law, typically governs," absent preemption. *Akazawa v. Link New Tech. Int'l, Inc.*, 520 F.3d 1354, 1357 (Fed. Cir. 2008).[2]  Thus, this Court looks to the Fourth Circuit for the standard of review, the Federal Circuit for substantive patent law, and state law for interpretation of the contracts at issue.

---

[2]    Preemption may arise, for example, when state law would recognize a patent assignment that does not comply with the Patent Act's requirement that "all assignments of patent interest[s] be in writing," *Sky Techs. LLC v. SAP AG*, 576 F.3d 1374, 1379 (Fed. Cir. 2009) (citing 35 U.S.C. § 261), or give validity to a future "obligation to assign," as those questions are "intimately bound up with the question of standing in patent cases." *DDB Techs., L.L.C. v. MLB Advanced Media, L.P.*, 517 F.3d 1284, 1296 (Fed. Cir. 2008).

**B.      Subject Matter Jurisdiction**

Article III standing constitutes a "bedrock constitutional requirement," without which a plaintiff cannot proceed in federal court. *United States v. Texas*, 599 U.S. 670, 675 (2023).  To demonstrate constitutional standing, a plaintiff must show that (1) she has sustained an injury in fact, (2) the injury can be traced to the defendant's actions, and (3) a favorable judicial decision would likely redress her injury. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  That injury must be "legally and judicially cognizable," *Texas*, 599 U.S. at 676, as well as "concrete, particularized, and actual or imminent." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).

According to TemperPack, Vericool's right to bar others from practicing the Asserted Patents stands subject to Storopack's control.  This limitation, in TemperPack's view, proves fatal, because without the capacity to exclude, Vericool "cannot claim any injury from TemperPack's alleged infringement." (TemperPack's Mot. to Dismiss Br. ("Defs.' Br.") (ECF No. 19) at 8).  In support of this conclusion, TemperPack invokes a line of Federal Circuit caselaw holding that a plaintiff without exclusionary rights does not suffer an injury in fact from infringement. (*Id.* at 4–5).  The Court is unpersuaded.

**1.      Injury in Fact & Exclusionary Rights**

Patents are, in effect, a government authorized monopoly over a claimed invention. *Aero Spark Plug Co. v. B. G. Corp.*, 130 F.2d 290, 293 & n.3 (2d Cir. 1942) (Frank, J., concurring).  They possess "the attributes of personal property," 35 U.S.C. § 261, including the right "to exclude others" from their use. 35 U.S.C. § 154(a).  When a party practices the patented technology without the consent of the patentee, they have violated the exclusionary

rights conferred by Congress, and the patentee has a cause of action for infringement.  35 U.S.C. §§ 271, 281.

Absent those exclusionary rights, what the law terms infringement would otherwise be called market competition.  Thus, the Federal Circuit has previously held that "to suffer legal injury from the act of infringement," a party must possess "a legally protected interest in the patent created by the Patent Act," which is to say, the "touchstone" for establishing injury in fact "in a patent infringement suit is whether a party . . . has an exclusionary right in a patent." *WiAV Sols. LLC v. Motorola, Inc.*, 631 F.3d 1257, 1264–65 (Fed. Cir. 2010) (quoting *Propat Int'l Corp. v. RPost, Inc.*, 473 F.3d 1187, 1193 (Fed. Cir. 2007)).  Exclusionary rights "involve the ability to exclude others from practicing an invention or to forgive activities that would normally be prohibited under the patent statutes." *Lone Star Silicon Innovations LLC v. Nanya Tech. Corp.*, 925 F.3d 1225, 1234 (Fed. Cir. 2019) (internal quotations omitted).  In other words, a party must have a right to sue (*i.e.*, "exclude") or license (*i.e.*, "forgive") a patent to suffer an injury in fact from its infringement.

*WiAV* and its progeny conclude that "[s]tanding in a patent infringement case is derived from the Patent Act," because "the Patent Act creates the legally protected interest in dispute" and "the right to assert infringement of those interests comes from the Act itself."  631 F.3d at 1264 (internal citations omitted).  But this conflates Article III standing with a plaintiff's cause of action.  Indeed, for many years the Federal Circuit treated the absence of a valid cause of action as a jurisdictional bar that a plaintiff could not later ameliorate.  *See, e.g.*, *AsymmetRx, Inc. v. Biocare Med., LLC*, 582 F.3d 1314, 1318 (Fed. Cir. 2009); *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359, 1364 (Fed. Cir. 2010).

6

However, as the Federal Circuit has recognized, these cases are no longer good law. In 2015, the Supreme Court disabused the lower courts of the notion that so-called "prudential" or "statutory standing" implicates a court's subject matter jurisdiction. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127–28 & n.4 (2014). *Lexmark* emphasized that whether a plaintiff has a viable cause of action constitutes "a matter of statutory interpretation," which seeks to "ascertain . . . the scope of the private remedy created by Congress." *Id.* (internal quotations omitted). By contrast, constitutional standing goes to whether a plaintiff has a "case or controversy" within the meaning of Article III. *Id.*

### 2.     Separating the Patent Act & Article III

The Federal Circuit subsequently recognized that *Lexmark* was "irreconcilable" with the court's earlier precedent "treating [35 U.S.C.] § 281" — the private right of action in the Patent Act — "as a jurisdictional requirement." *Lone Star*, 925 F.3d at 1235. To conform with *Lexmark*, the court abrogated its earlier caselaw and held that "whether a party possesses [a cause of action] does not implicate standing or subject matter jurisdiction." *Id.* at 1235–36. If any latent ambiguity remained, the Federal Circuit made clear the following year that a plaintiff's rights under the Patent Act are divorced from the existence of an Article III injury.

In *Schwendimann v. Arkwright Advanced Coating*, the assignee of six patents sued for willful infringement of those patents. 959 F.3d 1065, 1069–70 (Fed. Cir. 2020). Unbeknownst to the plaintiff, the patent owner improperly filed the paperwork to perfect her assignment. *Id.* After the defendant moved to dismiss for lack of standing, the plaintiff sought to ameliorate the defect with a new agreement filed with the USPTO. *Id.* The district court held that this post-litigation memorialization cured any prior infirmity. *Id.* On appeal, the Federal Circuit affirmed and concluded that "there [was] no 'standing' issue to be decided [o]n [] appeal." *Id.* at 1071.

7

The dissent vociferously objected. It read *Lone Star* to merely hold that a plaintiff who held "*some* exclusionary rights in the patent" need not also prove that she had "*all* substantial rights" in the patent — the standard for statutory standing under the Patent Act — to satisfy Article III. *Id.* at 1077 (Reyna, J., dissenting) (emphasis in original). But, the dissent reasoned, a plaintiff who lacks "any [] exclusionary rights in the patents" at the time of filing suit "has no Article III standing." *Id.* And an assignee's "[p]ost-suit activities" could not "confer Article III standing that was otherwise lacking when the suit was filed." *Id.* The majority disagreed. In its view, the dissent was inviting statutory standing to intrude the province of Article III. *Id.* at 1071 (explaining that "our earlier decisions treating the prerequisites of the Patent Act as jurisdictional were wrong."). As the court cogently summarized:

> The dissent . . . asserts that the Patent Act's prerequisites must be treated as jurisdictional because the right to exclude has constitutional underpinnings. There are two problems with that contention. First, *Lone Star* states the opposite in a precedential decision . . . . Second, not only has the Supreme Court made clear that virtually all statutory filing prerequisites are non-jurisdictional, but it has held that the registration requirement in the Copyright Act is non-jurisdictional. The Copyright Act is no less tied to the Intellectual Property Clause in the Constitution than is the Patent Act.

*Id.* at 1071 n.6.

*Schwendimann* broke the final tether between the Patent Act's statutory requirements and the Article III inquiry. But both it and *Lone Star* failed to end debate over whether exclusionary rights remain a prerequisite for constitutional standing, and in the intervening years, district courts have split on the issue.[3] One court has noted that the "body of case law for constitutional

---

[3]     *Compare Kenall Mfg. Co. v. Cooper Lighting, LLC*, 2020 WL 4015324, at *2 (N.D. Ill. July 16, 2020) (distinguishing "Article III standing, on the one hand, from having a viable claim under [the Patent Act]" and noting that a plaintiff can suffer a concrete injury "even if it has no viable claim" for relief under the Patent Act) *and Bos. Sci. Corp. v. BioCardia, Inc.*, 524 F. Supp. 3d 914, 917 (N.D. Cal. 2021) (finding that a party lacking ownership of the asserted patents suffered a judicially cognizable injury to its financial interest even if it had no statutory cause of action) *with Uniloc USA, Inc. v. Apple, Inc.*, 2020 WL 7122617, at *2, *4 (N.D. Cal. Dec. 4,

standing in patent cases" is "inconsistent," "lacks coherence and breeds confusion." *Uniloc USA, Inc. v. Motorola Mobility, LLC*, 2020 WL 7771219, at *3 (D. Del. Dec. 30, 2020), *aff'd*, 52 F.4th 1340 (Fed. Cir. 2022). Another has noted ongoing "confusion about the interplay between th[e] . . . framework of statutory right to sue [under the Patent Act] and [Article III] standing." *Apple*, 2020 WL 7122617, at *3. Subsequent Federal Circuit caselaw has offered no further guidance to lower courts.[4]

According to one view, *Lone Star* and its progeny did not "present the panel with the opportunity to hold that a plaintiff possessing *less than* exclusionary patent rights would nonetheless have constitutional standing." *Id.* at *4. On another, the answer to that question was necessarily subsumed within the Federal Circuit's broader pronouncement: if the statutory requirements of § 281 exist separate from Article III, then a plaintiff's injury in fact cannot be circumscribed by the rights that a litigant may possess under the Patent Act. This Court believes that fidelity to Supreme Court and Federal Circuit precedent compels the latter approach.

The exclusionary rights doctrine arose at a time when courts often conflated statutory standing with the requirements of Article III. *See Intell. Tech*, 101 F.4th at 814 (acknowledging

---

2020) (reading *Lone Star* as not "present[ing] the panel with the opportunity to hold that a plaintiff possessing *less than* exclusionary patent rights would nonetheless have constitutional standing) *and Cirba Inc. v. VMWARE, Inc.* (*Cirba II*), 2020 WL 7489765, at *2–3 (D. Del. Dec. 21, 2020) (Stark, J.) (concluding that post-*Schwendimann*, Article III still requires exclusionary rights).

[4]    *See In re Cirba Inc.* (*Cirba III*), 2021 WL 4302979, at *1 (Fed. Cir. Sept. 22, 2021) (noting that it was "not clear [whether] *Lexmark* and *Lone Star*" displaced the court's exclusionary rights precedents and therefore declining to resolve the issue in a mandamus posture); *Uniloc USA, Inc. v. Motorola Mobility LLC*, 52 F.4th 1340, 1344–45 (Fed. Cir. 2022) (avoiding standing by finding that the appellant was collaterally estopped from asserting standing); *Intell. Tech LLC v. Zebra Techs. Corp.*, 101 F.4th 807, 813–14 (Fed. Cir. 2024) (finding exclusionary rights are *per se* sufficient to confer Article III standing without resolving whether they are necessary).

that "many of this court's opinions had improperly melded the injury-in-fact inquiry with the § 281 inquiry"). At the heart of the exclusionary rights doctrine is the claim that a litigant has not suffered a judicially cognizable injury from infringement if that party cannot exclude others from the patent, which is to say, a party must have rights under the Patent Act to suffer an injury in fact. But in *Lone Star* and again in *Schwendimann*, the Federal Circuit, applying *Lexmark*, severed standing under the Patent Act from standing under Article III. Indeed, *Lone Star* cautioned against "confus[ing] the requirements of Article III — which establish when a plaintiff may invoke the judicial power — and the requirements of [35 U.S.C.] § 281 — which establish when a party may obtain relief under the patent laws." 925 F.3d at 1235. And *Schwendimann* sustained a plaintiff's right to sue based on a retroactive conferral of exclusionary rights to the plaintiff. 959 F.3d at 1070. That remedy was possible only if the defect in the plaintiff's exclusionary rights did not implicate subject matter jurisdiction, since "hornbook law" teaches that jurisdiction "'depends upon the state of things at the time the action is brought.'" *Grupo Dataflux v. Atlas Glob. Grp., L.P.*, 541 U.S. 567, 570 (2004) (quoting *Mollan v. Torrance*, 22 U.S. (9 Wheat.) 537, 539 (1824) (Marshall, C.J.)); *see Intell. Tech*, 101 F.4th at 814 (explaining that courts must endeavor to distinguish rights under the Patent Act from Article III, because "Article III standing . . . is incurable if absent at the initiation of suit."). On the heels of *Lexmark*, *Lone Star* and *Schwendimann*, the Court sees no basis to subscribe to an interpretation of constitutional standing that requires a litigant to hold rights under its statutory cause of action.

In every other area of substantive law, a party may suffer an Article III injury without possessing a corresponding cause of action to vindicate those rights. *See, e.g.*, *Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 536 (7th Cir. 2011) (explaining that even if "a plaintiff's claim under his preferred legal theory fails," that failure "has nothing to do with subject-matter jurisdiction").

And a party may possess a cause of action without suffering an Article III injury. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 426–27 (2021). The two are neither synonymous nor coextensive with one another. Patent infringement is not so *sui generis* as to require its own special Article III analysis, nor could the Patent Act lawfully command such an outcome, as the constitutional requirements for standing are "essential and unchanging." *Lujan*, 504 U.S. at 560. Put another way, nothing about Vericool's underlying cause of action requires this Court to erect novel jurisdictional roadblocks.

With this understanding in mind, Vericool plainly satisfies Article III's requirements. The quintessential injury in fact involves harm to a party's pecuniary interest. *TransUnion*, 594 U.S. at 425 ("the most obvious [Article III injuries] are traditional tangible harms, such as . . . monetary harms"). And a party can suffer financial harm from a patent infringer even if that party holds no exclusionary rights in the patent itself. Here, TemperPack's "flagship product" allegedly mirrors the design, structure and features of the Vericool Plus — Vericool's primary product practicing the Asserted Patents — and targets the same customer base. (Compl. ¶¶ 14–15, 27–28, 34–36, 42–44). TemperPack does not dispute that it and Vericool constitute market competitors, or that its allegedly infringing conduct causes financial injury to Vericool. *See Lexmark*, 572 U.S. at 125 ("allegations of lost sales and damage to [] business reputation give [rise to] standing under Article III"). It has only levied various objections to Vericool's ability to raise claims under the Patent Act. The Court addresses those objections below, as questions of statutory — not constitutional — standing.

### C.    Vericool's Cause of Action

Even when a plaintiff has constitutional standing, she must also possess a "cause of action encompass[ing] [her] particular [] claim" to proceed in federal court. *Lexmark*, 572 U.S.

11

at 125–27.  Though sometimes referred to as "prudential standing" or "statutory standing," a plaintiff's cause of action does not go to Article III standing; it constitutes a merits inquiry that requires "apply[ing] traditional principles of statutory interpretation."  *Id.* at 128.  The Court addresses Vericool's cause of action below.

### 1.    Substantial Rights Doctrine

The Patent Act confers a cause of action for infringement only on a "patentee."  35 U.S.C. § 281.  The term patentee "includes not only the patentee to whom the patent was issued but also the successors in title to the patentee."  35 U.S.C. § 100(d).  In interpreting the term "successor[] in title," the Federal Circuit distinguishes between "an assignment," which allows a party "to sue in its own name," and a "mere license," which does not.  *AsymmetRx*, 582 F.3d at 1319.  This division between assignees and licensees turns on whether "'the agreement transferred all substantial rights' to the patents."  *Id.*  (quoting *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 840, 874 (Fed. Cir. 1991)).  From these authorities, the Federal Circuit has identified three potential categories of plaintiffs in patent infringement suits: (1) the patent owner or assignee of the patent, who holds "all substantial rights" — that is, "all legal rights to the patent," — and may therefore "sue in their own name alone"; (2) exclusive licensees and others who possess "exclusionary rights and interests" in the patent, but not the "entire bundle of sticks," and may therefore sue only if "the patent owner is joined in the suit"; and (3) a nonexclusive or "bare" licensee who do not possess all substantial rights or exclusionary rights in the patent, and therefore "cannot even participate as a party to an infringement suit."  *Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1339–41 (Fed. Cir. 2007).

The insight behind the Federal Circuit's tripartite standard is clear enough:  a litigant who possess all substantial rights in a patent has become the patentee as defined by 35 U.S.C.

12

§ 100(d) and may therefore sue in its own name.  A party with less than "all substantial rights in a patent" cannot be a proper plaintiff and "must join the patent owner" to sustain their suit. *Mentor H/S, Inc. v. Med. Device All., Inc.*, 240 F.3d 1016, 1017–19 (Fed. Cir. 2001).  This distinction does not rely on "formalities or magic words" but "on the substance of what was granted." *Lone Star*, 925 F.3d at 1229. [5]

Although simple in theory, the substantial rights standard betrays incertitude in application.  The key inquiry focuses on "who owns the patent," which turns on whether a plaintiff possess "all substantial rights." *Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336, 1342 (Fed. Cir. 2006).  What rights are "substantial?"  The only definition offered by the Federal Circuit is entirely circular:  the "court has defined 'all substantial rights' as those rights sufficient for the licensee or assignee to be 'deemed the effective patentee under [the Patent Act].'" *Sicom Sys., Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971 (Fed. Cir. 2005) (quoting *Prima Tek II, LLC v. A–Roo Co.*, 222 F.3d 1372, 1377 (Fed. Cir. 2000)).  Nor has the Federal Circuit ever "establish[ed] a complete list of the rights" that must be considered "to determine whether a [patentee] has transferred away sufficient rights to render an[other] the owner of a patent." *Alfred E. Mann Found. For Sci. Rsch. v. Cochlear Corp.*, 604 F.3d 1354, 1360 (Fed. Cir. 2010).  District courts must instead appraise "the 'totality' of the agreement," which includes the "intention of the parties" and the "substance of what was granted by the agreement." *Id.*; *Mentor H/S*, 240 F.3d at 1017.  Among the morass of relevant rights include who can "use, assert, license or transfer the covered patents," "whether the transferor retained reversionary rights in or

---

[5]  For this reason, it does not matter whether a contract terms itself an assignment or a license; a licensee who holds "all substantial rights" in the patent may "be deemed the effective 'patentee.'" *Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343, 1349 (Fed. Cir. 2016) (quoting *Prima Tek II, LLC v. A–Roo Co.*, 222 F.3d 1372, 1377 (Fed. Cir. 2000)).

ongoing control over the patents" and whether the assignor has conveyed or retained the right to

sue for infringement. *Lone Star*, 925 F.3d at 1229; *Alfred E. Mann Found.*, 604 F.3d at 1360–61;

*AsymmetRx*, 582 F.3d at 1320–21. A variety of arduous and non-exhaustive multifactor tests

have been floated by courts and practitioners to synthesize the Federal Circuit's caselaw. [6]

Unsurprisingly, courts and commentators have struggled to harmonize the Federal

Circuit's opaque substantial rights jurisprudence. The doctrine has been described as "tricky"

and "complex" by practitioners, "unpredictable" and "confounding" by scholars, and

"convoluted law" by one member of the Circuit's bench.[7] This Court shares those qualms with

state of the doctrine. Still, several common-sense intuitions that underly the assignment/license

distinction prove helpful. First, a patentee should not run the risk of having their patent

"invalidated or held unenforceable" because of the conduct of third parties who lack an adequate

interest in defending the patent. *Evident Corp. v. Church & Dwight Co.*, 399 F.3d 1310, 1314

(Fed. Cir. 2005). Likewise, an alleged infringer should not face "multiple lawsuits and

liabilities" from different plaintiffs claiming an interest in the patent. *Id.* These risks arise

because a patent "is, in effect, a bundle of rights" that a patentee may divide and transfer in any

number of ways. *Alfred E. Mann Found.*, 604 F.3d at 1360 (Fed. Cir. 2010) (internal quotations

omitted). But only a party holding "a sufficiently large portion of this bundle" can be considered

the patent owner and "sue for infringement in its own name." *Id.* This is not simply a

---

[6]     *See Gensetix, Inc. v. Baylor Coll. of Med.*, 354 F. Supp. 3d 759, 768 (S.D. Tex. 2018),
*aff'd in part, rev'd in part and remanded sub nom. Gensetix, Inc. v. Bd. of Regents of Univ. of
Tex. Sys.*, 966 F.3d 1316 (Fed. Cir. 2020) (applying a nine-factor test); Christopher J. Morten,
*Standing with a Bundle of Sticks: The All Substantial Rights Doctrine in Action*, 28 Fordham
Intell. Prop. Media & Ent. L. J. 477, 489–90 (2018) (deriving eleven relevant factors)

[7]     Morten, *supra* note 6, at 479–80; Xuan-Thao Nguyen, *Patent Prudential Standing*, 21
Geo. Mason L. Rev. 17, 19–20 (2013); *Abraxis Bioscience, Inc. v. Navinta LLC*, 625 F.3d 1359,
1368 (Fed. Cir. 2010) (Newman, J., dissenting)

"tally[ing]" exercise of the "number of rights" held by each party, as the Court's inquiry must be qualitative, not quantitative. *Lone Star*, 925 F.3d at 1229. Thus, the Federal Circuit often focuses more on what rights the transferor retained than on the rights that the transferee obtained, as a transferor with only a paucity of rights can still defeat a transferee's statutory standing if those rights are of significant import. *See id.* at 1231 (asking whether the assignor retained "any substantial rights" in the patents).

Some formal lines can be drawn to add to those background principles. The cases converge on three rights that strongly signal that a litigant holds all substantial rights. First, a contract that "does not include the right to make, and the right to use, and the right to sell" does not confer "the whole patent-right." *Waterman v. Mackenzie*, 138 U.S. 252, 255 (1891). Put another way, the ability to practice the patent constitutes a necessary ingredient to be the patentee. Second, the right to sue infringers stands at the top of the hierarchy of rights, since "a transferee that receives all substantial patent rights . . . would *never* need consent from the transferor to file suit." *Intell. Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1344 (Fed. Cir. 2001) (emphasis in original); *accord Keranos, LLC v. Silicon Storage Tech, Inc.*, 797 F.3d 1025, 1032 (Fed. Cir. 2015). But a purported delegation of enforcement without a corresponding ability to practice the patent constitutes a hollow conveyance of rights. *Ortho Pharm. Corp. v. Genetics Inst., Inc.*, 52 F.3d 1026, 1034 (Fed. Cir. 1995). Third, a restriction on alienation — a limitation on a transferee's ability to assign or license the patent — cuts strongly against a finding of substantial rights, *Lone Star*, 925 F.3d at 1231, reflecting the ordinary

15

centrality of alienability in the bundle of property rights.[8]  With this understanding in mind, the

Court turns to Vericool's contracts.

### 2.    Vericool's Patent Rights

The two operative contracts consist of the 2023 Security Agreement and the Licensing

Agreement. ██████████████████████████████████████████████████████████



██████████████████████████████████████████████  (*See* 2023 Security Agreement § 18.12;

Licensing Agreement § 11.3(a)).

### a.    Ohio's Law of Contracts

Contract interpretation seeks "to give effect to the intent of the parties," presuming that

"the[ir] intent . . . is reflected in the language" of the contract. *Westfield Ins. Co. v. Galatis*,

2003-Ohio-5849, 797 N.E.2d 1256, ¶ 11.  In interpreting that language, Ohio distinguishes

between "primary" and "secondary" interpretive rules. *Sutton Bank v. Progressive Polymers,*

*L.L.C.*, 2020-Ohio-5101, 163 N.E.3d 546, ¶ 15.  Primary rules are linguistic canons that "giv[e]

guidance on how to interpret the meaning of certain words." *Id.*  This includes giving common

words their plain and ordinary meaning and technical terms their technical meaning unless

---

[8]     *See* 1 William Blackstone, Commentaries *134 ("The [] absolute right . . . of property . . .
consists in [its] free use, enjoyment, and disposal"); Lee Anne Fennell, *Adjusting Alienability*,
122 Harv. L. Rev. 1403, 1405 (2009) (describing alienability as "one of the standard incidents of
ownership")

[9]     ██████████████████████████████████████████████████████████████████
██████████████████████████   But choice of law provisions are not self-executing.  Ohio law
governs only if the choice of law clause itself is valid and enforceable.  That threshold question
— whether to give effect to a choice of law clause — stands subject to the conflicts of law rules
of the state of Virginia. *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496–97 (1941).
Virginia has long "look[ed] favorably upon choice of law clauses in a contract, giving them full
effect except in unusual circumstances." *Hitachi Credit Am. Corp. v. Signet Bank*, 166 F.3d 614,
624 (4th Cir. 1999) (citing *Tate v. Hain*, 25 S.E.2d 321, 324 (Va. 1943)); *see Union Cent. Life
Ins. Co. v. Pollard*, 26 S.E. 421, 422 (1896).  There are no unusual circumstances here and
accordingly no bar to application of Ohio law.

"some other meaning is clearly evidenced." *Foster Wheeler Enviresponse, Inc. v. Franklin Cnty. Convention Facilities Auth.*, 1997-Ohio-202, 678 N.E.2d 519, 526.  When, as here, multiple writings are "executed as part of the same transaction," those documents must be "read as a whole." *Id.* (collecting cases).  In so doing, courts should prefer a construction that "give[s] effect . . . to every provision" of the contracts over a construction that would render a part superfluous or meaningless. *Farmers' Nat'l Bank v. Del. Ins. Co.*, 94 N.E. 834 (Ohio 1911), syllabus ¶ 6.

When a contract is unambiguous, a court cannot look beyond the four corners of the document in search of a party's surreptitious intentions. *Alexander v. Buckeye Pipe Line Co.*, 374 N.E.2d 146, 150 (Ohio 1978).  Ambiguity arises when a contract cannot be given a definite meaning; that is, the contract stands susceptible to at least two conflicting yet reasonable interpretations. *Westfield*, 2003-Ohio-5849, ¶ 11.  Only if, after applying all of the ordinary interpretive tools, indeterminacy persists, may a court then turn to secondary rules of interpretation. *Sutton Bank*, 2020-Ohio-5101, ¶ 15.  These secondary rules function as tiebreakers and include the *contra proferentem* canon, under which a contract "should be strictly construed" against the drafter, and liberal construction in favor of a party subject to unequal bargaining power. *Id.*

### b.      Construction of the 2023 Agreements

The core of the parties' dispute centers on the relationship between the 2023 Security Agreement and the Licensing Agreement.  In brief, § 7.8 of the Security Agreement requires Vericool to "take such action as [Storopack] will reasonably deem appropriate" if the Asserted Patents are infringed.  Sections 1.6 and 1.7 further grant Storopack a security interest in "all rights to sue," all "claims for . . . infringement[]," and all "proceeds of infringement suits."  Yet

§ 6.2(a) of the Licensing Agreement specifies that  These terms stand in some tension: the Security Agreement contemplates Storopack's control of the Patents' enforcement while the Licensing Agreement How the Court resolves this facial inconsistency could prove determinative of who holds all substantial rights in the Patents.

Both parties wisely acknowledge that the two agreements should be read in tandem. (Plaintiff's Confidential Opposition Brief ("Pl. Br.") (ECF No. 30) at 2; Defendants' Reply Brief ("Defs.' Reply") (ECF No. 36) at 3). In Vericool's telling, the Security Agreement only governs subject to the Licensing Agreement, and so to "the extent the provisions conflict," the Licensing Agreement must triumph. (Pl. Br. at 3, 6 n.6). TemperPack asserts precisely the opposite. In its view, the 2023 Security Agreement must be given precedence over the Licensing Agreement, because Vericool's construction would strip the Security Agreement of any meaning. (Defs.' Reply at 3, 5).[10] The Court cannot categorically adopt either party's interpretation.

Vericool points to § 11.8 of the Licensing Agreement, which it surmises "explicitly prioritizes the License Agreement over the 2023 Security Agreement." (Pl. Br. at 6 n.6). Section 11.8 provides that:



Vericool argues that the Security Agreement constitutes and therefore must be subordinate to the Licensing Agreement. That argument fails at the first step.

---

[10]      Ordinarily, when parties execute two contracts on the same subject matter, the last in time controls. *Cleveland Police Patrolmen's Ass'n v. Cleveland*, 643 N.E.2d 559, 564 (Ohio Ct. App. 8th Dist. 1994). But here, the two Agreements were executed simultaneously, leaving neither superior to the other in the event of irreconcilable conflict.

For Vericool's construction to succeed, the Security Agreement must be ▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ into the Licensing Agreement. (*Id.*) Under Ohio's doctrine of incorporation by

reference, a separate document may be read into a contract as if it were fully enumerated therein.

18 Ohio Jur. 3d Contracts § 149. The separate document must be described "in such terms that

its identity may be ascertained beyond doubt" and "clearly demonstrate that the parties intended

to incorporate all or part of the referenced document." *Volovetz v. Tremco Barrier Sols., Inc.*,

2016-Ohio-7707, 74 N.E.3d 743, ¶ 27 (Ct. App. 10th Dist.) (quoting 11 *Williston on Contracts*

§ 30:25 (4th ed.)). Mere reference to a separate document does not suffice; the language "must

clearly communicate that the purpose of the reference is to incorporate the referenced material

into the contract." *Id.* (quoting *Northrop Grumman Info. Tech., Inc. v. United States*, 535 F.3d

1339, 1345 (Fed. Cir. 2008)); *see also Bd. of Educ. of Martins Ferry City Sch. Dist. v. Colaianni

Constr., Inc.*, 2023-Ohio-2285, 219 N.E.3d 1021, ¶ 91 (Ct. App. 12th Dist.) (collecting cases

supporting the same).

The Licensing Agreement lacks any conspicuous language of incorporation. It references

the Security Agreement only twice, once to say that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and later to note

that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Licensing Agreement §§ 3.1(b), 10.3). Neither

description provides the sort of clear statement that Ohio requires to incorporate a separate

document. For example, a design contract specifying that plans will "comply with the standards

established by" a separate contract did not "clearly communicate that the purpose of the

reference . . . [was] to incorporate the referenced material into the contract" as a matter of Ohio

law. *Colaianni Constr.*, 2023-Ohio-2285, ¶ 92. Similarly, Ohio courts have held that the front

19

page of a contract that provided that a product was sold "with manufacturers standard . . . warranty" did not "clearly demonstrate[e] that the parties intended to incorporate" that warranty. *HB Martin Logistics, Inc. v. Hissong Grp., Inc.*, 2023-Ohio-4836, 233 N.E.3d 150, ¶ 28 (Ct. App. 9th Dist.). Thus, the Security Agreement has not been incorporated into the Licensing Agreement, and Section 11.8 does not speak to or control the order of precedence between it and the Security Agreement.

Rejecting Vericool's argument does not *ipso facto* require adopting TemperPack's. TemperPack appeals to "the relative purposes of the two agreements," and posits that the Security Agreement must prevail over any separate agreements, because it "exists to protect Storopack's Collateral." (*Id.* at 1, 3). Even accepting TemperPack's attenuated framing and looking only to purpose, TemperPack offers no basis to conclude that Storopack would place greater import on its liens in the Security Agreement than on its licenses in the Licensing Agreement, to say nothing of Vericool's intent as the other contracting party. As two commercially sophisticated actors, Storopack and Vericool understood how to draft an order of priority if they desired one agreement to trump the other, ████████████████████ ████████████████████ And as TemperPack itself acknowledges, the Court must avoid an interpretation of *either* agreement that would render the other nugatory. (Defs.' Reply at 5–6). Yet a blanket rule prioritizing the Security Agreement over the Licensing Agreement would risk precisely this.

The Court cannot subscribe to either party's *per se* rule arranging one contract over the other. The analysis must therefore proceed to the specific terms of the two Agreements.

### i.      Vericool's Enforcement Rights

TemperPack argues that the 2023 Security Agreement divests Vericool of the right to

independently enforce the Asserted Patents.  It divines this reading from four provisions of the

Security Agreement:  §§ 1.6, 1.7, 7.8 and 13.1.  Sections 1.6 and 1.7 grant Storopack a security

interest in "all rights to sue and other claims for past, present and future infringements" of the

Asserted Patents and "all income, damages and other amounts payable . . . including . . . royalty

fees [and] proceeds of infringement suits."  (2023 Security Agreement §§ 1.6–1.7).  Section 7.8

adds that, in the event of infringement, Vericool "will notify [Storopack] . . . and, subject to the

Terms of the Licensing Agreement, [Vericool] will take such action as [Storopack] will

reasonably deem appropriate."  (*Id.* § 7.8).  Finally, § 13.1 provides that if Vericool defaults on

the Security Agreement, Storopack may "take possession and sell, lease or otherwise dispose of"

the Asserted Patents, and "use or exercise any rights of ownership."  (*Id.* § 13.1).  Putting these

pieces together, TemperPack surmises that Vericool can only sue to protect the Asserted Patents

with Storopack's permission; that such permission, once granted, may at any time be rescinded;

and that, if Storopack accedes to litigation, Storopack may direct Vericool's conduct of the suit.

(Defs.' Br. at 8).

The Court disagrees.  At their broadest, three of the four cited provisions bear no

relevance to Vericool's present capacity to sue.  Sections 1.6 and 1.7 convey a security interest to

Storopack.  A security interest offers a creditor recourse in the event of the debtor's default.

*Security Interest*, Black's Law Dict. (11th ed. 2019).  But ownership of a security interest is not

synonymous with ownership of the underlying property.  The former guarantees a debt; the latter

vests only if the agreement specifies an assignment of the incumbered collateral.  *Roman*

*Cleanser Co. v. Nat'l Acceptance Co. of Am.* (*In re Roman Cleanser Co.*), 43 B.R. 940, 944

21

(Bankr. E.D. Mich. 1984), *aff'd*, 802 F.2d 207 (6th Cir. 1986) (distinguishing between security interests in and assignments of intellectual property rights).

The Security Agreement contains no such assignment.  To the contrary, the Agreement unambiguously recites that Storopack's title to the Asserted Patents springs forth only in the event of default, which the contract effectively defines as a breach of its terms.  (2023 Security Agreement §§ 2.1, 13.1).  Thus, Storopack holds a lien on Vericool's infringement claims and any resulting damages.  (*Id.* at §§ 1.6–1.7, 3.4).  But Storopack cannot exercise dominion over the underlying collateral unless and until Vericool defaults on its obligations.  Vericool's owner avers that no such default has occurred, and TemperPack adduces no evidence to dispute that representation.  (Jobe Decl. ¶ 4).  Even crediting that "'all rights to sue' for infringement and all 'damages' including 'royalty fees' and 'proceeds of infringement suits'" are "part of the 'Collateral' securing Storopack's loans," (Defs.' Reply at 4–5 (quoting 2023 Security Agreement §§ 1.2, 1.6)), that avails TemperPack nothing, as nothing in the Security Agreement purports to vest enforcement rights in Storopack.

Seeking to avoid this conclusion, TemperPack underscores the capacious language found in § 7.8 of the Security Agreement.  That provision requires Vericool to "take such action as [Storopack] will reasonably deem appropriate" if the Asserted Patents are infringed.  (2023 Security Agreement § 7.8).  When read in isolation, § 7.8 could indubitably hobble Vericool's enforcement rights.  But its requirements are "subject to the terms of the Licensing Agreement." (*Id.*)  And the Licensing Agreement exudes deference to Vericool.  It provides that:





(Licensing Agreement § 6.2(a)).[11]

Section 6.2(a) of the Licensing Agreement stands in some tension with § 7.8 of the Security Agreement. The former puts Vericool squarely in command, while the latter posits a relationship more of vassalage than independence. Vericool argues that this tension vanishes in the face of the "subject to" language in the Security Agreement, which it interprets to mean that "the License Agreement trumps the 2023 Security Agreement on this issue." (Pl. Br. at 3–4, 6). TemperPack retorts that this construction is "baseless," illogical and "violate[s] fundamental contract construction principles," because it neuters Storopack's rights under the Security Agreement. (Defs.' Reply at 2). Reading the contracts together, TemperPack proposes the following interpretation: "if Storopack 'deems appropriate,' then [Vericool] 'will take' actions 'subject to the terms of the License Agreement,' such as bringing an action under the terms of License Agreement § 6.2." (*Id.* at 6). That is, Vericool may sue to prevent infringement if and only if Storopack consents. The Court cannot subscribe to such a scant reading of Vericool's enforcement rights.

---

[11]    The "Licensed Patents" of the Licensing Agreement include the Asserted Patents.

TemperPack's arguments hinge on the need for a unifying construction of the two contracts. The Court agrees with that objective. But there is no need to torture the plain text of the Licensing Agreement to salvage a unifying construction. The Security Agreement requires Vericool, "subject to the terms of the Licensing Agreement," to "take such actions as [Storopack] will reasonably deem appropriate . . . to protect [the Asserted Patents]." (2023 Security Agreement § 7.8). Three important limitations spring from this language.

First, § 7.8 by its terms stands "subject to" the Licensing Agreement. In context, "subject to" means, at minimum, that Storopack's control of Vericool is affected by the terms of the Licensing Agreement. *See, e.g.*, *Subject (adj.)*, sense 3, Black's Law Dictionary (11th ed. 2019) ("[d]ependent on or exposed to (some contingency)"); *Subject (adj.)*, sense II.8, Oxford Eng. Dict. (last updated Mar. 2024) ("[d]ependent upon a particular correcting or modifying condition; conditional upon") [https://doi.org/10.1093/OED/1445013164] [perma.cc/Z3ZA-6WHE].[12] Second, while the Security Agreement requires Vericool to execute Storopack's directives, it does not limit Vericool to taking *only* such actions as Storopack deems appropriate. In other words, Storopack's acquiescence is not a condition precedent to Vericool's right to sue. Third, the Security Agreement does not grant Storopack a blank check to dictate the conduct of Vericool. Rather, Storopack's edicts must be "reasonabl[e]," and not reasonable in some abstract sense, but towards a specific purpose: protection of the Asserted Patents. (Security Agreement

---

[12]    "Subject to" may also mean connote obedience, such that § 7.8 of the Security Agreement is rendered subservient to the terms of the Licensing Agreement. *See Subject (adj.)*, sense 1, Black's Law Dictionary (11th ed. 2019); *Clean Air Council v. United States Steel Corp.*, 4 F.4th 204, 209 (3d Cir. 2021) (discussing the two meaning of "subject to" as "governed or affected by" or "obedient to"). While this construction naturally fits the language of the contract — Storopack may direct Vericool's conduct complicit with the terms of the Licensing Agreement — the Court need not decide between the more limited or expansive reading of "subject to," as the same result obtains under either interpretation.

§ 7.8).  Thus, TemperPack cannot vitiate Vericool's enforcement rights with dubious

hypotheticals in which Storopack directs Vericool to abandon suit.  Such a command would

violate the letter and spirit of § 7.8.

Indeed, TemperPack's construction — not Vericool's — would "violate[] fundamental

contract construction principles" by "render[ing] terms of the [Licensing Agreement]," namely,

███████████████████████████████████████████████████ "meaningless."  (Defs.'

Reply at 5–6; Licensing Agreement § 6.2(a)).  ██████████████████████████████

lacks any consonance with TemperPack's construction, which would allow Vericool to litigate

only if it obtains and maintains an ongoing permission slip from Storopack.  Nor may

TemperPack circumvent the plain language of the Licensing Agreement by positing that the

Licensing Agreement only becomes operative if Storopack first requests Vericool to bring suit

under the Security Agreement.

When read together, the contracts speak with a unity of purpose:  Vericool has an

unfettered right — and duty — to enforce the Asserted Patents.  Consistent with that right, the

Security Agreement authorizes Storopack to direct Vericool to take additional reasonable steps to

protect the Patents, likely to shield Storopack from the risk that Vericool might under-enforce the

Patents.  In other words, Vericool may defend the Asserted Patents of its own volition, but if it

does not, Storopack may order it to do so.  That construction gives meaning to both agreements

without repudiating the language in either.  The Court need not flesh out how every hypothetical

dispute between Storopack and Vericool would be resolved.  It suffices to recognize that

Vericool's right to sue is not encumbered in a way that would deprive it of substantial rights in

the Asserted Patents.

###### ii.    Vericool's Alienation Rights

The parties next dispute the scope of Vericool's licensing rights in the Asserted Patents. Although this next step of the analysis involves several moving parts, the contracts ultimately paint a uniform canvass that affirms Vericool's right to alienate.

Section 2.2(b) of the Licensing Agreement



The Security Agreement imposes some constraints on Vericool.  Other than licenses authorized by the Licensing Agreement, Vericool agreed to "not (a) sell, assign, pledge or otherwise transfer or encumber all or any part of its interest in any of the [Patents or] (b) grant any license under any of the [Patents]," subject to three exceptions.  (Security Agreement § 7.10).  The first exception allows Vericool to bestow licenses to "marketing and distribution agents in the ordinary course of business consistent with past practices."  (*Id.*)  The second permits licensing "in the ordinary course of [Vericool's] business," but "only if such license is

necessary or desirable in the conduct of [Vericool's] business." (*Id.*) Finally, under the third exception, Vericool may award licenses "in connection with a sale of assets expressly permitted in the License Agreement, if and only if such license is on terms reasonably expected to maximize the gain to [Vericool] resulting from the granting of such license." (*Id.*) For its part, Storopack must "execute any documents" necessary for Vericool "to exercise its rights [] to license," but Storopack cannot "be required to do anything that may, in [its] sole judgment . . . , result in adversely affecting the lien granted hereunder or the assignment of the [Patents] located in any foreign jurisdiction." (*Id.*)

Putting the pieces together, when Vericool's and Storopack's agreements were executed,

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████ (Licensing Agreement §§ 2.2(b), 2.3(b)–(c)). Any other licenses would need to fall under one of the three enumerated exceptions in the Security Agreement. And Vericool could not sell or fully assign its interest in the Asserted Patents. TemperPack argues that the combination of these restrictions leaves Vericool bereft of meaningful alienation rights. But § 2.3(c)'s licensing restrictions no longer have any effect, undermining TemperPack's argument.

TemperPack makes much ado about Storopack's purported "right to refuse to execute any licensing documents 'in [its] sole judgment.'" (Defs.' Reply at 11 (quoting Security Agreement § 7.10)). But Storopack's right of refusal is not unfettered; Storopack may only avoid conduct that would "adversely affect[] [its] liens or [] assignment[s]." (Security Agreement § 7.10). True, what falls in that category is left to the "sole judgment" of Storopack. But that discretion

stands subject to the "implied duty of good faith and fair dealing" inherent in "every contract" under Ohio law. *Lucarell v. Nationwide Mut. Ins. Co.*, 2018-Ohio-15, 97 N.E.3d 458, ¶ 42. Thus, Storopack must have at least a good-faith basis to object to a putative license.

More importantly, § 7.10 of the Security Agreement applies only to licenses "*other than*" "licenses permitted to be granted pursuant to the terms of the License Agreement." (Security Agreement §§ 7.10, 3.6) (emphasis added). ████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████ Thus, few if any circumstances exist in which a license would need to comply with § 7.10 of the Security Agreement. But one important restriction does carry forth to the present: Vericool may not "sell, assign, pledge or otherwise transfer or encumber all or any part of its interest in any of the [Patents]" beyond the permitted licenses. (Security Agreement § 7.10(a)).

### 3. Vericool's Statutory Standing

The foregoing analysis renders Vericool the unequivocal holder of all substantial rights in the Asserted Patents, and thus a proper plaintiff to assert their infringement. VCOOL LLC fully assigned the Asserted Patents to Vericool on December 20, 2021; as of that date, Vericool was the unambiguous "patentee" under 35 U.S.C. § 281. Vericool did not divest itself of this status by granting Storopack a security interest in the Patents in 2021 and 2023, nor did it do so by conveying a nonexclusive license.

Vericool easily satisfies the gateway requirement of holding the right to make, use, and sell products practicing the Asserted Patents. *Waterman*, 138 U.S. at 255. Certainly, the right carries one limitation: ████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████ (Licensing Agreement § 2.3(b)). But this term does not affect Vericool's unfettered right to use and sell, and the burden on this right appears *de minimis*. ██████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████ Section 2.3(b)'s encumbrance — to the extent it can even be labeled as such — matters little to Vericool's substantial rights in the Patents.

Vericool also possesses "the most important" right of a patentee, the right to bring suit in its own name. *Alfred E. Mann Found.*, 604 F.3d at 1361. As explained above, Vericool retains an unfettered right to enforce and defend the Patents and may wield that right as it sees fit.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████ Vericool thus never needs Storopack's consent to sue. *Cf. Intell. Prop. Dev.*, 248 F.3d at 1344 (treating such consent as fatal to a finding of all substantial rights).

29

Consider instead the right to enforce acquired by Storopack.  Nothing in either the Security Agreement ██████████████████████████████████████████  An infringer thus faces no risk of "multiple lawsuits and liabilities" from Vericool and Storopack pursuing independent actions.  *Evident Corp.*, 399 F.3d at 1314.  Storopack stands entitled to receive notification from Vericool of infringing activity and the outcome of any litigation, but Vericool has a comparable right to notice.  ████████████████  Security Agreement § 7.5).  And mere notice to a party of the existence of a suit does not burden the right to enforce. *AsymmetRx*, 582 F.3d at 1319 (citing *Vaupel*, 944 F.2d at 875).  Indeed, the only purported enforcement right that TemperPack can identify in Storopack's arsenal is its ability, subject to the Licensing Agreement, to direct Vericool to "take such actions as [Storopack] will reasonably deem appropriate" to protect the Asserted Patents.  (Security Agreement § 7.8).  That provision only betrays that Vericool — not Storopack — bears responsibility for enforcing the Patents through suit.  The Security Agreement drives that point home in the very next section.  (*See* Security Agreement § 7.9 (requiring Vericool to "appear in and defend any action arising out of, or [] connected with, any of the [Asserted Patents]")).  ████████████████████████████
████████████████████████████████████████████████████████████

████ *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1251 (Fed. Cir. 2000).  Insofar as Storopack has any residual enforcement rights, those rights would be "illusory," because Vericool can "render that right nugatory by granting the alleged infringer a royalty-free sublicense." *Id.*

Vericool's alienation rights only cement its status as the patentee.  ████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████████████████████████████████████████████ And this

restriction in no way grants Storopack "the right to prevent [Vericool] from assigning the patents

at issue without prior consent." *Lone Star*, 925 F.3d at 1231.  By contrast, ████████████

████████████████████████████████ to the Asserted Patents.  (Licensing

Agreement § 2.2(b)).[13]  If there is one clear throughline in the Federal Circuit's caselaw, it is

this:  a non-exclusive license "cannot even participate as a party to an infringement suit,"

because they have *no* right to exclude others from practicing the patented claims.  *Microsoft*, 499

F.3d at 1339–41.  TemperPack's claim that Storopack's paltry alienation rights render it a

necessary party thus rings hollow.

     This does not mean that the substantial rights factors uniformly cut in Vericool's favor.

Its reversionary rights are tepid; Storopack holds a ██████████████████████████

███████████████████████████████████████████[14]  (Licensing

Agreement §§ 2.2(b), 10.3); *see Alfred E. Mann Found.*, 604 F.3d at 1360 (listing the duration of

the license and reversionary rights as among the relevant substantial rights).  ████████████

█████████████████████████████████ *Id.* at 1361.  ███████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████

---

[13] ███████████ (Licensing Agreement § 11.9(a)).  This limited freedom does not transform
Storopack's "bare" license into anything more.

[14] ███████████████████████████████████████████████
███████████████████████████████████████████████████
███████ (Licensing Agreement §§ 4.2, 10.2(a), 10.3).

(Licensing Agreement §§ 3.3(b), 4.2(a)).  One need look no further than Vericool's own obligations to observe meaningful supervision and control:  Vericool bound itself to "use consistent standards of quality in its manufacture of products," allow Storopack "to inspect such products and quality control records" and grant "reasonable access to the books and records of [Vericool]." (Security Agreement § 7.9).  Finally, Vericool alienation rights are not absolute.  So long as Storopack's security interest in the Asserted Patents remains active, Vericool may not assign or sell the Asserted Patents.  (*See* Pl. Br. at 11 (conceding this point)).

Despite these limitations, Vericool did not convey "all substantial rights" in the Asserted Patents.  *Lone Star*, 925 F.3d at 1231.  Vericool remains free to produce, use, and sell patented goods.  It may freely "sue accused infringers and license the patents." *Diamond Coating Techs., LLC v. Hyundai Motor Am.*, 823 F.3d 615, 619 (Fed. Cir. 2016).  It holds all of the "most important" rights central to being the patentee. *Id.*; *accord Alfred E. Mann Found.*, 604 F.3d at 1361.  The "intention of the parties" as revealed in their contracts, and the "substance of what was granted" therein, both underscore that Vericool remains entitled — indeed, obliged — to sue in its own name to defend the Patents.  And because Storopack holds no more than a "bare" nonexclusive license, it cannot be a necessary party. *Microsoft*, 499 F.3d at 1339–41.

## IV.   CONCLUSION

Vericool has both constitutional and statutory standing to litigate this action. TermperPack's allegedly infringing conduct causes injury to Vericool of the sort cognizable in federal court.  Vericool's conveyance of a nonexclusive license to Storopack did not undermine its status as a patentee with a valid cause of action.  Vericool may make, use and sell patented products; enforce the Patents by suit; and forgive otherwise unlawful activity through licensing. The Patent Act requires no more.  For this reason, the Court will DENY TemperPack's motion to

dismiss (ECF No. 18).

An appropriate Order will issue.

Let the Clerk file a copy of this Memorandum Opinion *under seal* electronically and notify all counsel of record.

_____/s/_____
David J. Novak
United States District Judge

Richmond, Virginia
Date:  July 2, 2024